# NEW YORK, LAKE ERIE, AND WESTERN RAIL-ROAD *v.* NICKALS.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued November 1, 2, 1886. — Decided November 29, 1886.

The Erie Railway Company, being embarrassed and in the hands of a receiver, appointed in a suit for the foreclosure of two of the mortgages upon the property of the company, its creditors and its shareholders, preferred and common, entered into an agreement for the reorganization of the company, to be accomplished by means of a foreclosure. Among other things it was agreed that there should be issued "preferred stock, to an amount equal to the preferred stock of the Erie Railway Company now outstanding, to wit, eighty five thousand three hundred and sixty nine shares, of the nominal amount of one hundred dollars each, entitling the holders to non-cumulative dividends, at the rate of six per cent. per annum, in preference to the payment of any dividend on the common stock, but dependent on the profits of each particular year as declared by the board of directors." The mortgage was foreclosed, and a new company was organized, and the new preferred stock was issued as agreed. The directors of the new company reported to its share and bond holders that during and for the year ending September 30, 1880, the operations of the road left a net profit of $1,790,620.71, which had been applied to making a double track, and other improvements on the property of the company. A, a preferred stockholder, on behalf of himself and other holders, filed a bill in equity to compel the company to pay a dividend to the holders of preferred stock. *Held,* That while the preferred stockholders are entitled to a six per cent. dividend in advance of the common stockholders, they are not entitled, as of right, to dividends, payable out of the net profits accruing in any particular year, unless the directors declare or ought to declare a dividend payable out of such profits; and that whether a dividend should be declared in any year, is a matter belonging in the first instance to the directors to determine, with reference to the condition of the company's property and affairs as a whole.

This was a bill in equity brought by a holder of preferred stock of the New York, Lake Erie, and Western Railroad Company, on behalf of himself and other stockholders, to compel the company to declare and pay a dividend to the preferred stockholders out of the net profits from the operations of the company during the year ending September 30, 1880. Decree below in favor of complainants, from which respondent appealed. The case is stated in the opinion of the court.

*Mr. W. D. Shipman* and *Mr. Benjamin H. Bristow* (*Mr. David Willcox* was with *Mr. Bristow* on his brief), for appellant, cited: *Williston* v. *Michigan Southern Railroad*, 13 Allen, 400; *Taft* v. *Providence & Fishkill Railroad*, 8 R. I. 310; *St. John* v. *Erie Railway*, 10 Blatchford, 271; *S. C.* 22 Wall. 136; *Warren* v. *King*, 108 U. S. 389; *Clearwater* v. *Meredith*, 1 Wall. 25; *Union Pacific Railroad* v. *United States*, 99 U. S. 402; *Barnard* v. *Vermont & Massachusetts Railroad*, 7 Allen, 512; *Verplanck* v. *Mercantile Ins. Co.*, 1 Edw. Ch. 84; *Butts* v. *Wood*, 38 Barb. 181; *Luling* v. *Atlantic Ins. Co.*, 45 Barb. 510; *S. C.* 50 Barb. 520; *S. C.* 51 N. Y. 207; *Boardman* v. *Lake Shore Railway*, 84 N. Y. 157; *Karnes* v. *Rochester & Genessee Railroad*, 4 Abbott's Pr. N. S. (N. Y.) 107; *Dent* v. *London Tramways Co.*, L. R. 16 Ch. Div. 344; *Richardson* v. *Vermont & Massachusetts Railroad*, 44 Vt. 613; *Hill* v. *Newichawanick Co.*, 8 Hun, 459; *S. C.* 71 N. Y. 593; *Spear* v. *Hart*, 3 Robertson, 420; *Culver* v. *Reno Real Estate Co.*, 91 Penn. St. 367; *Stevens* v. *South Devon Railway*, 9 Hare, 313; *Brundage* v. *Brundage*, 60 N. Y. 544; *Lombardo* v. *Case*, 45 Barb. 95; *Hopper* v. *Sage*, 47 N. Y. Superior Ct. 77; *Bright* v. *Lord*, 51 Ind. 272; *Chaffee* v. *Rutland Railroad*, 55 Vt. 110; *McGregor* v. *Home Ins. Co.*, 6 Stewart (33 N. J. Eq.), 181; *Elkins* v. *Camden & Atlantic Co.*, 9 Stewart (36 N. J. Eq.), 233; *Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Mumma* v. *Potomac Co.*, 8 Pet. 281; *Curran* v. *Arkansas*, 15 How. 304; *Railroad Co.* v. *Howard*, 7 Wall. 392

*Mr. C. E. Tracy*, for appellee, cited : *Bates* v. *Androscoggin Railroad*, 49 Maine, 491 ; *Boardman* v. *Lake Shore Railroad*, 84 N. Y. 157 ; *Prouty* v. *Michigan Southern Railroad*, 1 Hun, 655 ; *S. C.* 85 N. Y. 272 ; *Henry* v. *Great Northern Railway*, 4 Kay & Johns. 1 ; *Matthews* v. *Great Northern Railway*, 5 Jurist, N. S., Part 1, 284 ; *Allen* v. *Londonderry & Enniskillen Railway*, 25 Weekly Reporter, 524 ; *Dent* v. *London Tramways Co.*, L. R. 16 Ch. Div. 344, 353 ; *Barnard* v. *Vermont & Massachusetts Railroad*, 7 Allen, 512 ; *Richardson* v. *Vermont & Massachusetts Railroad*, 44 Vt. 613 ; *Westchester & Philadelphia Railroad* v. *Jackson*, 77 Penn. St. 321 ; *Scott* v. *Eagle Fire Ins. Co.*, 7 Paige, 198.

Mr. JUSTICE HARLAN delivered the opinion of the court.

By the decree below it was adjudged, in accordance with the prayer of the bill, that the New York, Lake Erie and Western Railroad Company was required by its articles of association to declare a dividend of six per cent. upon its preferred stock, for the year ending September 30th, 1880, payable out of the net profits accruing that year from the use of its property, after meeting operating expenses, interest on funded debt, rentals of leased lines, and other fixed charges. A judgment was rendered against it for $20,280 — the amount which the plaintiffs would have received if a dividend had been made — with interest thereon from January 15, 1881, to the date of the decree, and also for their costs and disbursements. The cause was referred to a special commissioner to ascertain the names of all other parties entitled to receive similar dividends.

The case made by the pleadings, exhibits, and proofs, is, substantially, as will now be stated.

The Farmers' Loan and Trust Company having commenced an action in the Supreme Court of New York for the foreclosure of two mortgages executed by the Erie Railway Company upon its line of railway, property, rights, privileges, and franchises — one of September 1, 1870, to secure its obligations known as first consolidated mortgage bonds and sterling loan bonds, and the other of February 4, 1874, to secure its

obligations known as second consolidated mortgage bonds and gold convertible bonds — and having also brought ancillary suits for the foreclosure of the same mortgages in the States of New Jersey and Pennsylvania, certain parties, on the 14th of December, 1877, entered into a plan and agreement for the readjustment of their rights in the mortgaged premises upon an equitable basis. Those constituting in that agreement the parties of the first part were holders of common and preferred stock of the Erie Railway Company, of coupons of the first consolidated mortgage and sterling loan bonds, and of bonds and coupons both of the second consolidated mortgage and gold convertible series. The parties of the second part, Edwin D. Morgan, John Lowber Welsh, and David A. Wells, were purchasing trustees. The agreement provided for coöperation in all proceedings for final foreclosures and sales in the respective States under the mortgage of February 4, 1874; for the purchase of the mortgaged premises and franchises by the trustees with bonds and coupons and other means to be placed at their disposal for that purpose by the parties of the first part; and for the organization by such trustees, in conformity with the laws of New York, of a new corporation, with an amount of stock not exceeding the then amount of the stock of the Erie Railway Company, and which should hold the property, rights, and franchises so purchased, subject to six prior mortgages then resting upon the premises or upon part of them, including the first consolidated mortgage of September 1, 1870. The new corporation was required, as the consideration for the property, rights, and franchises purchased, to deliver to the parties of the first part its funded coupon bonds, bearing interest at seven per cent. in gold, to an amount equal in the aggregate to the coupons of the first consolidated mortgage to be funded by those parties; mortgage bonds, bearing six per cent. interest in gold, to an amount equal to the principal of the second consolidated and gold convertible bonds held by the parties and secured by the mortgage of February 4, 1874 — the back interest to be represented by funded coupon bonds. In reference to the sterling loan bonds, the agreement provided that they should be regarded as having been ex-

changed for the first consolidated mortgage bonds on the 1st of September, 1875, the coupons due on that day being funded at the rate of six per cent. per annum as it stood previous to such assumed exchange.

The provisions of the plan and agreement which bear more or less upon the question before the court, are as follows :

"13. Preferred stock, to an amount equal to the preferred stock of the Erie Railway Company now outstanding, to wit, eighty five thousand three hundred and sixty nine (85,369) shares, of the nominal amount of one hundred dollars each, entitling the holders to non-cumulative dividends, at the rate of six per cent. per annum, in preference to the payment of any dividend on the common stock, but dependent on the profits of each particular year, as declared by the board of directors.

"14. Common stock, to an amount equal to the amount of the common stock of the said company now outstanding, to wit, seven hundred and eighty thousand shares, of the nominal amount of one hundred dollars each."

"18. Preferred stock of the old company, in respect of which three dollars gold for each share has been or may be paid, and common stock of the old company, in respect of which six dollars gold per share has been paid or may be paid, may be exchanged for the new stock, in paragraphs 13 and 14 mentioned, share per share, preferred for preferred, and common for common, without any liability to make any further payment in respect of such new stock: *Provided, however,* That such new stock, whether common or preferred, shall be issued and held in conformity with and subject to the trust for voting hereinafter mentioned.

"19. In addition to the new common and preferred stock, the parties of the first part shall also receive for the amount of such payments, as mentioned in the last preceding paragraph, non-cumulative income bonds, without mortgage security, payable in gold, in London and New York, on the first day of June, 1977, and bearing interest from December 1, 1879, also payable in gold, in London and New York, at the rate of six per cent. per annum, or at such lesser rate for any

fiscal year as the net earnings of the company for that year, as declared by the board of directors and applicable for the purpose, shall be sufficient to satisfy; these bonds to have yearly coupons attached.

"20.  Preferred stock, in respect of which two dollars gold per share has been paid or may be paid, and common stock, in respect of which four dollars gold per share has been or may be paid, may be exchanged share for share, but in conformity with and subject to the said trust for voting, for new stock of like class, without any liability to make any further payment in respect of such new stock; but no income bonds or other obligation, or security shall be issued or delivered in respect of such reduced payments.

"21.   .   .   .  ; and all payments made or to be made in respect of old, preferred or common stock shall be deemed to be in consideration of the concessions and agreements made by the holders of the said first and second consolidated mortgage and gold convertible bonds, the available funds resulting from such concessions being used for the improvement or increase of the property of the new company.

"22.  The stock of the new company, both common and preferred, not required for exchange as above provided, may, with the consent of the parties of the first part, but not otherwise, be issued and disposed of by the company for its own benefit, at such rates and upon such terms as to the said company may seem proper.  All moneys which have been or may hereafter be paid in respect of stock as above set forth, and which shall not be required for the purpose of carrying into execution this plan and agreement, shall be expended for the benefit of said new company, or in the improvement or increase of its property, under the direction of the parties of the first part, and any balance not so expended shall be paid over to the said new company."

The property and franchises in question were sold under decrees of foreclosure on the 24th of April, 1878, and were purchased by the trustees, subject to the before mentioned six mortgages.  Immediately thereafter, on April 26th, 1878, the purchasing committee and their associates organized the New

York, Lake Erie and Western Railroad Company, in conformity with statutes providing for the reorganization of railroads sold under mortgage, and for the formation in such cases of new companies. Laws of N. Y., 1874, c. 430; 1876, c. 446. The provisions of the before mentioned plan and agreement were set out in the articles of association. On the 9th of December, 1880, the board of directors submitted to shareholders and bondholders a report of the operations of the new company for the fiscal year ending September 30, 1880, from which it appears that the gross earnings for that year were $18,693,108.86, while the operating expenses were $11,643,925.35, leaving $7,049,183.51 as "net earnings from traffic." To this sum the report adds $783,956.65 "as earnings from other sources," making $7,833,140.16 as the total earnings for the year in question. From the last sum, $6,042,519.45 were deducted for "interest on funded debt, rentals of leased lines, and other charges," leaving, in the language of the report, "a net profit from the operations of the year of $1,790,620.71." Referring to the latter sum, the report continues: "This amount, together with $737,119.34 received during the year from the assessments paid on the stock of the Erie Railway Company, has been applied to the building of double track, erection of buildings, providing additional equipment, acquiring and constructing docks at Buffalo and Jersey City, and to the addition of other improvements to the road and property."

The theory of the present suit is that the sum of $1,790,620.71—ascertained to be the "net profit" derived from the operations of the company for the fiscal year ending September 30, 1880, after paying operating expenses and fixed charges—constituted a fund applicable, primarily, to the payment of a six per cent. dividend upon preferred stock. The use of that fund for any other purpose was, it is claimed, a breach of trust on the part of the company and a violation of rights secured to preferred stockholders, both by the plan and agreement of December 14, 1877, and by the company's articles of association. On the day the directors made their report to shareholders, they declared, by resolution, that in the then condition

of the company's property, they did not "deem it wise or expedient to declare a dividend upon its preferred stock." It also clearly appears in evidence that the earnings for the year in question, after paying operating expenses, and fixed charges, together with the amount realized from assessments paid on stock, were, in good faith, used in improving the company's road and other property; that these improvements were in pursuance of a general plan marked out pending negotiations for reorganization; that the estimate of their extent and cost was made with reference to a general understanding that they would be commenced and carried to completion as rapidly as possible with money derived from assessments on stockholders, from concessions of interest by bondholders, from earnings of the company, and from other sources; that the capacity of the company to make earnings with less expense than formerly in proportion to service rendered, and therefore its ability to earn the net profit which it did in 1880, was due to the bettered condition of the road and its equipment arising from these improvements, "thus, in the increase of traffic, and in the reduction of expenses, producing this result of $1,790,-620.71." The testimony of Mr. Jewett, the president of the company, which is uncontradicted by any evidence in the record, is that the use of that fund in the way in which it was applied was imperatively demanded by the interests as well of creditors, shareholders, and bondholders, as of the public. In answer to the question, whether these expenditures increased the earning capacity of the road and diminished relatively the expense of doing business, he said: "In my judgment, if these improvements had not been made, and most judiciously made, the company could not have paid its fixed charges; *it would have again gone into bankruptcy and the entire interest of the stockholders been destroyed.*"

The court below adjudged, in effect, that the right to a dividend, for the year ending September 30, 1880, payable out of the "net profit" arising from the operations for that period, was absolutely secured to preferred stockholders both by the plan and agreement and by the articles of association. Such, it held, was the contract between the company and

the preferred stockholders, which the court was not at liberty to disregard. This, in our judgment, is an erroneous interpretation of both the agreement and the company's charter. There is nothing in the language of either necessarily depriving the directors of the discretion with which managing agents of corporations are usually invested, when distributing the earnings of property committed to their hands. As was said by the court, in *Clearwater* v. *Meredith*, 1 Wall. 25, 40, "when any person takes stock in a railroad corporation he has entered into a contract with the company that his interests shall be subject to the direction and control of the proper authorities of the corporation, to accomplish the object for which the company was organized." The directors of such corporations, having opportunities not ordinarily possessed by others of knowing the resources and condition of the property under their control, are in a better position than stockholders to determine whether, in view of the duties which the corporation owes to the public, and of all its liabilities, it will be prudent in any particular year to declare a dividend upon stock. While their authority in respect of these matters may, of course, be controlled or modified by the company's charter, and while the power of the courts may be invoked for the protection of stockholders against bad faith upon the part of the directors, we should hesitate to assume that either the legislature or the parties intended to deprive the corporation, by its managers, of the power to protect the interests of all, including the public, by using earnings when necessary, or when, in good faith, believed to be necessary, for the preservation or improvement of the property intrusted to its control.

The claim of the appellees is based mainly on the 13th article of the agreement of 1877. It is contended that, as the non-cumulative dividend to which preferred stockholders were entitled was "dependent on the profits of each particular year, as declared by the board of directors," the intention was to require the declaration and payment of a *dividend* in every year when it should be officially declared that there were net profits from the operations of that year.

It is not without significance that the words just quoted

from the preliminary agreement for organization are omitted from that paragraph of the articles of association which, in obedience to the requirement of the statute, Laws of 1876, c. 446, § 1, sub-div. 2, specifies the rights of each class of stockholders. That paragraph provides that the holders of preferred stock shall be entitled to "non-cumulative dividends at the rate of six per cent. per annum in preference to the payment of any dividend on common stock." The omission, in that connection, of the words "but dependent on the profits of each particular year, as declared by the board of directors," gives some force to the suggestion of counsel that the contemporaneous construction of those words by the parties was, that they conferred no such right upon preferred stockholders as they now claim. Independently of this view, we are of opinion that the contention of appellees is not sustained by a reasonable construction of the agreement. That instrument did, indeed, provide for preferred shareholders being paid a dividend of six per cent. before any dividend was paid to common shareholders. But it was not intended to confer upon the former an absolute right to a dividend in any particular year, dependent alone on the fact, or the official ascertainment of the fact, that there were profits in that year, after paying operating expenses and fixed charges. The words of the 13th article " as declared by the board of directors" do not qualify the words ",dependent on the profits for each particular year." They should rather be read in connection with the preceding words, "non-cumulative dividends, at the rate of six per cent. per annum, in preference to the payment of any dividend on the common stock." Preferred stockholders of the old company, receiving in exchange preferred stock in the new company, did not thereby become, creditors of the latter. Their payments on account of old stock were in consideration of the concessions and agreements made by bondholders. In certain circumstances they also received income bonds. They were stockholders in the old corporation, and they held that relation to the reorganized company. What was stipulated to be paid to them as holders of preferred stock in the new company was not a *debt*, payable

in every event out of the general funds of the corporation, but a *dividend*, "as declared by the board of directors," and payable out of such portion of the profits as should be set apart for distribution among shareholders; non-cumulative, because "dependent on the profits of each particular year," and not to be fastened on the profits of succeeding years. That the parties contemplated a declaration of a dividend, and not a mere statement of net profits during a designated period, is made evident by the requirement that "dividends" to preferred stockholders should be paid "in preference to the payment of any dividend on the common stock." This language is not consistent with the theory that the holders of preferred stock were entitled to six per cent. thereon simply because there were profits, and irrespective of any declaration of a dividend. A declaration of profits, as, in itself, and without further action by the directors, entitling shareholders to dividends, is unknown in the law or in the practice of corporations. Dividends are "declared" by some formal act of the corporation — the question whether there are or are not profits being settled entirely by the accounts of the company as kept by subordinate officers, not by the mere statement of directors as to what appears upon its books.

A different view would lead to results which sound policy would seem to forbid, and which, therefore, it is not to be supposed were contemplated by the parties. For, if preferred stockholders become entitled to dividends upon a mere ascertainment of profits for a particular year, the duty of the company to maintain its track and cars in such condition as to accommodate the public and provide for the safe transportation of passengers and freight would be subordinate to their right to payment out of the funds remaining on hand after meeting current expenses and fixed charges. Indeed, there is some ground to contend that, according to appellees' interpretation of the charter, the directors were not at liberty, in any year when the current receipts were in excess of operating expenses, to pay even interest on funded debt, or rentals of leased lines, before paying a dividend on preferred stock. We are of opinion that while the agreement of 1877 and the articles of asso-

ciation sustain the claim of preferred stockholders to a six per cent. dividend in advance of common stockholders, the former are not entitled, of right, to dividends, payable out of the net profits accruing in any particular year, unless the directors of the company formally declare, or ought to declare, a dividend payable out of such profits ; and whether a dividend should be declared in any year is a matter belonging in the first instance to the directors to determine, with reference to the condition of the company's property and affairs as a whole. As the evidence shows that the profits for the year ending September 30, 1880, were applied to objects that were legitimate and proper, and as the condition of the company was not such as to make the declaration of a dividend a duty upon the part of the directors, we perceive no ground upon which the claim of the appellees can be sustained.

Attention is called by counsel to the language of the 19th article of the plan and agreement of reorganization, as throwing some light on the true interpretation of the 13th article. We do not think that that article aids the contention of appellees. The non-cumulative income bonds, provided for in the 19th article, were to bear six per cent. interest, or such lesser rate, "for any fiscal year, as the net earnings of the company for that year, as declared by the board of directors and applicable for the purpose, shall be sufficient to satisfy." So far from these words aiding the contention of appellees, they tend to show that the directors had the right to determine whether the condition of the company did not require a reduction of the interest. Such, we think, is the meaning of the words " and applicable for the purpose." The applicability of net earnings for interest on such income bonds could only be determined by them.

A case very much resembling this is *St. John* v. *Erie Railway Co.*, 22 Wall. 136, 147. Certain creditors of that company received preferred stock, in lieu of payment of their debts, under a clause of its charter providing that such stock should be entitled " to preferred dividends out of the net earnings of said road (if earned in the current year, but not otherwise), not to exceed seven per cent. in any one year, payable semi-annu-

ally, after payment of mortgage interest and delayed coupons in full." A preferred stockholder sought by suit to enforce full payment of his dividends from the net earnings, prior to any payment on account of new leases of roads, or of debts subsequently contracted for borrowed money used in the repair and equipment of the road, in paying rent on leased lines, and interest on the money so borrowed. The Circuit Court, 10 Blatchford, 271, 276, said: "What it (the stock) is entitled to is 'dividends,' and only 'dividends,' and they are of a defined and special character. It is entitled to nothing else. It has no privilege or priority by reason of being preferred stock, except in reference to stock that is not so preferred, that is, common stock. In reference to such common stock the preferred stock is entitled to its specified preferential dividends, and is not entitled to anything else in reference to anything." Upon appeal to this court it was held that the suit could not be maintained; that the takers of the preferred stock had abandoned their position as creditors and assumed that of stockholders, in which capacity they could claim dividends only when they were declared or should be declared; that they were only entitled to dividends out of the net earnings of the principal road and its adjuncts accruing in the current year; that, as the company had not agreed to be limited in the exercise of its faculties and franchises, it had the right to conduct its operations in good faith as it might see fit; and that the materials for the computation of its net earnings in any particular year were to be derived from all of its operations, viewing its business as a unit, and not from a part of its operations, or without reference to the necessary and legitimate purposes to which its current receipts might be applied for the benefit of all interested in the property. These principles were again applied in the analogous case of *Warren* v. *King*, 108 U. S. 389. See also *Union Pacific Railroad* v. *United States*, 99 U. S. 402; *Barnard* v. *Vermont and Massachusetts Railroad*, 7 Allen, 512; *Williston* v. *Michigan Southern Railroad*, 13 Allen, 400; *Chaffee* v. *Rutland Railroad*, 55 Vt. 110; *Taft* v. *Hartford, Providence, & Fishkill Railroad*, 8 R. I. 310; *Elkins* v. *Camden & Atlantic Co.*, 36 N. J. Eq. (9 Stewart) 233;

*Lockhart* v. *Van Alstyne*, 31 Mich. 76; *Culver* v. *Reno Real Estate Co.*, 91 Penn. St. 367.

The views we have expressed are not inconsistent with the adjudged cases upon which appellees' counsel chiefly rely. A brief reference to some of them will be sufficient. In *Dent* v. *London Tramways Co.*, 16 Ch. Div. 344, decided by Sir George Jessel, Master of the Rolls, at special term, the company increased its capital stock by an issue of shares of the same denomination as the prior shares, "bearing a preferential dividend of six per cent. per annum over the present shares of the company, dependent upon the profits of the particular year only." There the question was whether the company was bound to pay preferred stockholders the amount of a dividend declared for the half year ending December 31, 1878, but which it had refused to pay, and also a dividend for the year 1879, which, it is to be inferred from the report of the case, ought to have been declared. The precise point determined is shown in these remarks of the court: "The argument of the company amounts to this, that inasmuch as they have improperly paid to their ordinary shareholders very large sums of money which did not belong to them, they, the company, are entitled to make good that deficiency by taking away the fund available for the preference shareholders, to an amount required to put the tramway in proper order. When the argument is stated in that way, it is clear that it cannot be sustained. The company either have a right to recover back from the ordinary shareholders any sum over-paid, or not. If they have a right, they must recover them; if they have no right to recover them, *a fortiori* they have no right to recover them from the preference shareholders, and, of course, still less right to take away the dividends from the preference shareholders."

It is scarcely necessary to say that the present case is entirely different from the one decided by the English court. No question was raised in the latter as to the authority and discretion of directors to use earnings for the improvement of the corporate property from year to year. It was, in effect, a contest simply between preferred and common stockholders.

The only point decided was, that the payment of large sums of money to common stockholders which should have been used in the repair of the tramway, was not a valid ground for refusing to pay preferred stockholders dividends to which they were entitled. To withhold dividends from preferred stockholders, in order to make good a deficiency caused by payments to common shareholders which ought not to have been made, was practically to destroy the right of preference. A different decision would have made the preferred shareholders pay what the company should have recovered from the common stockholders by suit.

The case of *Richardson* v. *Vermont & Massachusetts Railroad*, 44 Vt. 613, 622, is also relied upon to support the decree below. There the question was as to the right to recover interest dividends on stock, to be paid in full at a specified date, if there was then sufficient money in the company's treasury. If there was not enough for that purpose, then as much should be paid as the amount in the treasury justified; the balance when the treasurer was able to make payment. The defence was that there was an adequate remedy at law and that the stock certificates were void. The certificates were held to be valid, the right to resort to equity was sustained, and the company was required to pay. The vital fact in that case distinguishing it from this one is, that the company substantially admitted that it had funds applicable to the payment of the claims, if they should be held to be valid. Some of the general observations of the court seem to be in accord with the views we have expressed. "The mere fact," the court said, "of the corporation having funds in its treasury sufficient in amount to pay the orators, would not be sufficient to show the *ability of the corporation* contemplated in the vote and certificates. That ability must consist of a fund adequate not only for the payment of the claims of the plaintiffs in the cause, but for the payment of all other stockholders having like claims; and must be a surplus fund over and above what is requisite for the payment of the current expenses of the business, for discharging its duties to creditors, and over and above what reasonable prudence would require to be kept in the treasury to

meet the accidents, risks, and contingencies incident to the business of operating the railroad. In other words, there must be such pecuniary ability as would, but for the obligation to pay this interest, justify the payment of a dividend to stockholders."

Our attention is also called to the case of *Boardman* v. *Lake Shore & Michigan Southern Railway*, 84 N. Y. 157. But it has no direct bearing on the questions before us. It only decides that the dividends provided for in the contract there in question were not only to be preferred, but, being guaranteed, were cumulative, and a specific charge upon the accruing profits, to be paid, as arrears, before any other dividends were paid on the common stock. "The doctrine," said the court, "that preference shareholders are entitled to be first paid the amount of dividends guaranteed, and of all arrears of dividends or interest, before the other shareholders are entitled to receive anything, and, although they can receive no profits where none are earned, yet as soon as there are any profits to divide they are entitled to the same, is fully supported by authority." It thus appears that that was a contest between preferred and common stockholders. No questions arose as to whether the company, under the circumstances, could or could not, in their discretion, have withheld a declaration of dividend.

Without further discussing the questions involved or suggesting other grounds upon which our conclusion might rest, we are satisfied that the complainants are not entitled to recover.

*The decree is reversed, and the cause is remanded, with directions to dismiss the bill.*